Case number 20-1149, Donna Zirbel v. Ford Motor Company. Arguments not to exceed 15 minutes per side. Ms. Shensky, you may proceed for the appellant. Thank you. My name is Catherine Shensky and I represent Donna Jean Zirbel, the plaintiff in this ERISA action. May it please the court. And let me mention that I will be reserving four minutes for rebuttal. On behalf of my client, I'm asking the court to reverse the decision of the Eastern District of Michigan, finding that my client is liable to pay $243,189.70 in overpaid lump sum benefits paid to her as an alternate payee under the Appellee's General Retirement Plan. As we've presented in our facts, the overpayment to Ms. Zirbel came after a period of six months in which Ms. Zirbel repeatedly told Ford's third-party administrator that the numbers were wrong, repeatedly asked them to recalculate the benefit. And after at least three recalculations and two occasions when the third-party administrator indicated they would do no recalculations because they claimed the numbers were correct, Ms. Zirbel was placed in the position of having to simply decide to put an end to this and take the money. Just from an equity standpoint, why shouldn't she have to give the money back? I mean, she knew she was getting too much. She got this windfall. I mean, just from fundamental fairness, why shouldn't she have to give it back? Well, first of all, the law I don't think allows it. But in terms of what you've just commented on, Judge Thapar, while she certainly had believed that the number that she got for the retroactive benefits was too high, she was convinced that what she got for the future benefit was far too low. It must be remembered that she had met with her former husband and knew what he was making in retirement benefits. She was supposed to get at least 50 percent of his retirement benefit. And if he's getting a retirement benefit between $5,000 and $6,000... But wait, but wait, wait, wait. That's not part of your claim. I mean, she's not saying that part was inaccurate, we now realize. She's saying that both sides of this were inaccurate. Okay, but she doesn't have that claim in front of us now. Well, the question is, what did she know and what did she not know? I mean, that's one of the arguments that's made by Ford here. Well, maybe it would help to pull... You do the argument however you wish, but one of your arguments is about the Planning Committee. Are you focused on that? I'm certainly focused. And one of the issues, I agree, is the Retirement Committee and the way they handled this appeal. Is it a process problem? I mean, we're all in agreement that the Planning Committee did the right thing in the sense of what the right calculation was, because of course, that's your main position. You kept telling them the right one and they ignored it. And now you want to stop them from doing the right thing. So what did the Planning Committee do wrong? I assume by Planning Committee, you're referring to the Retirement Committee. Yes. Okay. All right. The Retirement Committee, first of all, didn't make the initial determination. That was made by Conduit, which was the third party administrator. Conduit generated the denial on its own letterhead. Okay. So you can go through the facts. I'm just trying to figure out what is it you want us to do under the heading of that argument? What's the thing you want to add under the heading of that argument? Do you want to talk about whether it's arbitrary and capricious review? Do you want to talk about why it was wrong? Do you want to talk about why the process was wrong? What I want to talk about is why de novo review is appropriate here based upon the conduct of the Retirement Committee. Yes. They are required to provide a full and fair review of an appeal. Even though that Ford argues that the Retirement Committee did take a look at this the second time, and there's not a dispute that they did, the question is, what did they do when they got the appeal? If you read the testimony of Mr. Dupuis, who's the member of the Retirement Committee, he said they didn't discuss any of the circumstances that were presented in the appeal itself. They decided that based upon the plan provisions, that there was an overpayment. They claimed there was an honest mistake, and as a result of that, she had to pay it back. That was the extent of their analysis in this case, and that is not in compliance with ERISA. So that's my argument. And that was my argument for one of the bases for a de novo review of this case. And what about the plan language? I thought that maybe that was your, your most interesting argument, with respect to what creates an equitable remedy or legal remedy, because it has this without reservation language, I think, or without limitation language. Thank you, Judge Rader. That was actually my first argument, and my first argument is that the language... It's too late. I apologize. My argument is that the language of the plan cuts the legs out from under any right of forward to go after an overpayment here, because the language of the plan establishes a claim for money damages. The language here incorporates the phrase, in the event of an overpayment, the amount of the overpayment is to be returned. The amount of the overpayment, that translates to an action at law. That does not translate to an action in equity. Well, what should it say if it's going to create an action in equity? What should the language say? Well, I think there's a number of cases that demonstrate what it should have said. At the least, it should have said, for example, in Gilchrest, the language is that Unum could repay you. But again, we're talking about amount, and when we talk about amount, we're talking about an amount of money. We're not talking about the specific fund that is required in order for Ford to be able to pursue a claim in equity. Even Montanile uses the word amount. Excuse me, Your Honor? I'm not sure I'm pronouncing it correctly, but the U.S. Supreme Court decision, Montanile, it uses the word amount in that plan, and that was treated as equitable. Montanile. Well, I don't want to distract you. Go where you want to go. Well, I disagree that the language in Montanile is identical. I'm just saying the word amount is there. That's all I'm saying. Well, but it depends, I think, on what the meaning of the usage of the word is. In this case, the amount of the overpayments goes after a sum of money. It doesn't go after the overpayments specifically, and it opens up my client's general assets to a claimant law, which is specifically prohibited by ERISA. But in Montanile, Justice Thomas points out that you can deposit this in another fund, and if you commingle, you're allowed to have a lien on that fund. I mean, you don't even rely on Montanile below. You didn't invoke it at all. You thought Gilchrist stated the right rule. So that's the way it was framed to the district court judge. But to the extent you want to rely on the equitable lien limitation point, Montanile suggests you've got to show dissipation in non-traceable assets. And you not only didn't make that argument at all below, I don't even think you've made it here. I did. I did. I did, Your Honor. When we talked about the application of the Wells factors, excuse me, when I talk about the necessity of a specific fund and the need to have monies that were traceable back to that fund, that addressed this issue. Let me, can I ask you, when you look at these dissipation cases, they tend to involve individuals that either just don't have the money anymore, or it's a real hardship to track it down. So that really fits in with the someone who gets the judgment after an accident and suddenly they're reimbursed and the insurer wants some of that money. That's the classic pattern. What seems a little funny to me about this case, and for the purpose of what I'm going to say, treat it as a hypothetical. Let's just assume for the sake of argument, arbitrary and capricious review applies. Let's assume for the sake of argument, you are required to pay it back. So at this point, we're not in law or equity. The question is just, is this a contract obligation you can get out from under? Remember you sued, right? You sued and said no obligation. So if we put all the equity stuff to the side, I'm just wondering if it's worth fighting about. In other words, if you lose an arbitrary and capricious, if you lose and your client owes the money, why does any of this matter? Because you've acknowledged she has the resources. Doesn't this just delay? I mean, it just becomes a contract claim and they can come back in and say, okay, fine. Let's not fight over the equity stuff. You clearly owe the money back and we're just going to go in the law route. So what good does it do anybody? Because it seems quite clearly your client has the resources, making the first argument, the only argument that really matters. I'm not sure which first argument you're referring to because we've now talked about it. Well, the argument of whether you owe the money under the terms of the plan. Okay. Your suggestion, respectfully, that my client's general assets can be used to pay this money back is not permissible under ERISA. You have to identify the specific fund and we provided, and the record reflects in this case, that by the end of 2013, only $96,000 of that money remained. In that fund? In that fund. But right, but she's got IRAs, she's got gifts to children, and so forth. But the money that was received, the money that's being claimed by Ford is the retroactive taxable amount that never went into an IRA, never went into any that was about $269,000 before she got the $351,000. But all that money had to be taxed. All that money had to be put into a taxable fund. You can't, with due respect, invade an IRA because she doesn't have the money available in the taxable fund anymore. That's not permitted. It's not so much invade, it's just put a lien on it. Well, you can't put a lien on it either because that is in violation of ERISA's requirement that any claim impress an equitable lien on it. If there's no right to reimbursement because the language of the plan doesn't permit an equitable action, then it doesn't matter where the money is. They can't go after it. All right. All right. You'll get your full rebuttal. Did you want to say one more thing? I'm sorry. Go ahead. All I wanted to say was what happened is all the money went into that one, all the money that was left went into that one taxable fund. And that's money which does not equate any longer to what Ford wants back. There's not that much money in the account anymore. So essentially Ford's going after her general assets, which is not permitted. Okay. Thank you. Mr. Nelson. May it please the court. My name is Carl Nelson. Good morning. And I represent Ford Motor Company as the plan administrator for the Ford General Retirement Plan. As administrator of the plan, Ford has an obligation to act as the steward of the plan's assets and to protect them for the Every dollar mistakenly paid to one beneficiary reduces the plan assets available to other beneficiaries. That's why this court has held in Adams versus General Motors Company, that if the administrator mistakenly disperses the plan's limited funds, they have a duty to seek the return so that the proper beneficiaries may receive their pensions. The terms of the general. It seems like Ford didn't act as a very good steward in this case when she keeps telling you you're miscalculating it, you don't recalculate it. Why isn't her equitable estoppel argument carry some weight? She's saying, look, you were grossly negligent. And it seems to me there's a pretty legitimate argument you were. Judge LaPard, two responses to that. So first of all, there's no question that there was a mistake made here. And Ford owns that mistake. Ford processed thousands of these lump sum retirement opt-ins. And it was less than less than perfect. It made a mistake in at least this one of them. It acknowledges that. But so I guess the point is, let me let me just interrupt you, and I'm sorry. So I think I agree with you. If they just made a mistake, it'd just be telling you you're miscalculating it. What if that's not gross negligence, what is? Well, and that was my second point. Thank you, Your Honor, because that was my second point. And that is that if we look at the record closely, what's apparent is that throughout this period, Ms. Zerbel was asking the plan to recalculate the future, the forward looking prospective portion of the benefit payment. So remember, there were two portions of this benefit payment. One was a retroactive lump sum for benefits she hadn't collected yet. And the other was the forward looking future portion of her share of her former husband's pension. And she repeatedly asked the plan to recalculate that forward looking portion on the belief that mistaken belief, but the belief that the divorce decree, the quadro in the case gave her some enhanced share of it after her husband's death. She never raised questions about the retroactive portion, and particularly never raised questions about the benefit commencement date, which was the calculation error here, that in processing that amount, the plan simply used the wrong benefit commencement date. That issue was never raised at any point during any of the back and forth. So Mr. Nelson, let's say for the sake of argument, you're right, put the arbitrary capricious issue to the side. But just for the sake of my question, Ford in the abstract is entitled to win her claim, right? She sought a declaration that she doesn't have to pay. For the purposes of my point, she loses that and she does have to pay. Okay, so let's just leave it there for a second. Does ERISA preempt all contract actions? In other words, there's a part of me that just wonders why we're fighting about this equitable lien stuff. If we have someone with the assets and properly there's an obligation now to pay it back. Is there any other path to getting it back? In other words, just filing a contract action that just says, hey, we've resolved this, you do owe the money. Or does ERISA preempt all of that and the only way you can get the money back is the route you pursued in your counterclaim? Do you know what I'm saying? I think I do understand, Judge Sutton. And I believe that the reason we're here is because of the broad preemptive effect of ERISA. So that is the only path. I believe that's right, Your Honor. And so that takes you back to this initial argument. Does the contract, the underlying pension plan, create remedies in law and equity? There's no way around that. You always have to decide that before you figure out whether there can be recoupment, restitution, whatever you want to call it. Yeah, I believe that's right, Your Honor. As much as I would like to tell you otherwise, I believe that we have to answer the question whether restitution is an appropriate act. It's a classic judge question. Is there an easier way to handle this case? And thanks for saying no, not so. Yeah, I wish I could tell you otherwise. Okay, so the thing that is a little tricky for me, and it's quite unfair to the district court judge, because both of you were saying Gilchrist applies. No one was invoking Montanile. She was acknowledging she had the money. So it didn't look like a dissipation case. And then suddenly on appeal, the longer we go, particularly the longer she argues, the more she's saying, ah, this is a dissipation case with some traceability problems. What do we do about that? Well, I think Your Honor is correct. And your questions to opposing counsel were on point that the issue of Montanile never came up in the district court. And I would argue that it still is irrelevant here because the record doesn't support the fact pattern that was before the Supreme Court in Montanile. Go ahead. Explain that. Explain the record point. So in Montanile, just to set the background, recall, as I'm sure the court does, that the fact pattern there was that the entire account in question had first of all been segregated and then had been completely dissipated on non-traceable items, leaving nothing against which to seek restitution other than the defendant's general assets. So the record here is in at least three, I would say three important points. First, the record reflects that even after dispersing portions of the overpaid benefits, substantial cash remained in Ms. Zirbel's bank account. This retroactive payment was, you know, provided her in a check. She deposited the check into a TD bank account, commingled it with funds that were in that account, and then wrote checks out of that for various purposes. Can I just stop there? I just want education. So Justice Thomas says when you commingle, the lien can apply to the full account. What exactly does that mean? Does that mean you can account for things that come into it later? Do you freeze the amount at that time it's commingled and you can only lien that amount? How does it work when you have commingled? I get the commingling point. I see how it helps you, but I'm still not sure exactly what it means here, given the total amount that you're owed back, you claim. So let me try to answer that. And I think I'll answer it in two ways, if I can do this coherently. So first of all, once the money is commingled, of course, you can't track the dollars. So, you can take dollars that come out of, let's say, the TD bank account. You can't earmark those as attributable to the pension versus attributable to some other pre-existing source. So the entire pool of money that remains in that account then can be used to satisfy the equitable lien, because the dollars are indistinguishable. The second part of that question is in this case, we've got a kind of an added level of complication because then money was taken from that account and put in other places. So let's just, again, sorry, but you're answering the questions, which is always helpful. The IRA, so is that lienable? Yes, yes. And then the tax payments, how does the tax, the tax payments, is that just a function of reopening tax returns? Or is there a way in which that's not part of the obligation? In other words, it does seem very funny to pay you back the whole amount having, whatever, spent, you know, $80,000 on taxes. Is that all something she just has to reopen tax returns or get credits in future years? How does that work? So we submit, Your Honor, that the tax, the portion that she paid in tax attributable to the overpayment is traceable and recoverable in the same way, because Ms. Zirbel can claim a tax credit in a current year, a future year, for the overpayment in a previous year. She can demonstrate that that was an overpayment, that that amount has been reclaimed. She's had to make restitution of that amount and claim a tax credit going forward. So in essence, those dollars come back into her and can be returned to the plan. What about the repay these monies to Ford? There must be implications there as well. Is she over 59 and a half? She is. Well, I'm not sure there is. I think that is the answer. Mr. Nelson, can you add one thing you didn't answer that Judge Sutton asked is what happens if money comes in later? So this example, you have $500,000 in the account. That's what you want back. She spends $250,000, then deposits $500,000. She spends it on under that Supreme Court case, non-traceable items, food, whatever. The money comes in later. Can you get that money in an equitable lien case? Again, I apologize because this case presents that added complexity of tracing. If we didn't have the issue of tracing the money that was written out and went to other sources and recovering from that, if we had a simpler case where the money just went into the TD bank account, over time that bank account dropped to some level and then later she put assets back into it, under the ancient equitable principles, her recovery would be limited to whatever the lowest balance the TD bank account dropped to. But again, that's not a limiting factor in this case. But you said that's not the facts of this case. Why not? Because we're not limited to whatever the lowest balance in the TD bank account was at any point in time, because many of the proceeds, or at least arguably proceeds that were in the TD bank account, were written out to go to these other locations, to checking and savings accounts, to IRAs, to pay bank taxes that can be recovered. We're not limited to the pool of assets that are in the bank account. Aren't you limited to the lowest amount plus whatever you can trace? You would agree with that, right? In other words, under the case that I'm going to butcher too, Montanil, aren't you limited to the lowest amount, because you've conceded that is it, plus what you can trace versus what's non-traceable? I think that's right, Judge Lepar. I would say it this way. Once this money came into Ms. Zirbel's estate, it got distributed in a bunch of different buckets. If we're talking about the TD bank bucket, then what's recoverable there is whatever the lowest balance was in that account. We can still go to the other buckets. Just to make sure I understand what you mean by that, lowest amount, like when? Lowest amount at the time she put the recovery in, or lowest amount from then to today? In theory, it could be from then till today, but again, we're bound by the record that was below. What's the lowest amount in the record? The record indicates that after she made various distributions from the TD bank account, she had $96,690 left in the account. I see. That's the lowest. That's why you're not stressed out about this line of inquiry, because you think between the IRAs, that $90,000, the tax payments, it gets you to the 200 plus number. I believe that's right. I believe that's what the district court at least implicitly found. Implicitly, because no one made these arguments below. You're right, Your Honor. Exactly. Montanil was never raised as, again, I think that's where we restitution, what happens when you commingle and how you trace. In that case, the exception was because under those unique facts, as I was starting to say, the funding question had been segregated, had then been dissipated, and it was untraceable. None of that was ever developed in the record here. That issue was never even raised before the district court. There is no record and there's no record to have concluded or pre-seen the notion that the Montanil fact pattern would be argued. Can I ask you a question? This has put you in a slightly awkward position, so if you don't want to answer it, but is Gilchrist still right after Montanil? That's a fair question, Judge Sutton, and I think it is because, again, Montanil, let me just pull the language up here. In Montanil, the court, Judge Justice Thomas said, under this court's precedent, whether the remedy a plaintiff seeks is legal or equitable depends on two factors. First, the basis for the plaintiff's claim, and two, the nature of the underlying remedies. And then Montanil addressed that second prong, the nature of the underlying remedies. Gilchrist dealt with the first prong. Does the plan appropriately create a method of recovery? Does it identify a specific fund for recovery? And Montanil didn't change that. I see. I see. Judge Lepar, Judge Radler, do you have any other questions for Mr. Nelson? No. No, thank you. Thank you, Mr. Nelson, for answering our questions. We always appreciate it. Ms. Shensky, you've got your full rebuttal. Thank you, Your Honor. First of all... Ms. Shensky, before you start, can you answer Judge Sutton's initial question to your friend on the other side, which is, is a breach of contract action preempted? Yes. Okay, and do you have a case for that? You don't, don't worry. I don't have a case to cite to you at this time, but I agree that the sole remedy that Ford has available to it is an action in equity for recovery of pension funds that were overpaid. Okay, you can go ahead. I'm sorry. Okay. I didn't argue Montanil, first of all, because I didn't know about it when we argued before the district court. But secondly, I cited a number of cases that held for the proposition that you must have a specific fund from which you can get the money, and that money must be in the possession of the beneficiary. Montanil confirms that the money must be in the possession of the beneficiary. That's why I cited Montanil. But Montanil makes a clear distinction between assets that are not traceable, you know, food, whatever, and assets that are traceable. And surely an IRA or a tax payment, that's quite traceable. Correct. But we never got that far in the district court. Because the actual question, it seems to me that would have to be decided on in a hearing, in an evidentiary hearing, what's available that's traceable and what's not available. But you're the one that's supposed to bring all that up. Well, what I said is that all the money was dissipated. All or most of the money was dissipated. That's what I said before the district court. Okay. But well, maybe this is just the definitional point. One could attach the label dissipation to just about anything. But the point is, if the money went to a concrete, lienable place, that doesn't, quote, count as dissipation under Montanil. I mean, I realize if you're not looking at Montanil, you can't argue Montanil, but I don't know. Well, I need to clarify something. Mr. Nelson has indicated to you that when she got the overpayment from Ford, she deposited it into a number of different accounts. That is just in the lower court. Okay. Tell us the truth. Tell us the truth. The truth is that all of that money went, and it must be remembered, this was taxable money, so you can't deposit it into an IRA. All of this money, being taxable, had to go into a non-qualified account. And the non-qualified account was the TD Ameritrade account that held at the time about $260,000. Well, I don't know that Mr. Nelson misspoke. I probably am the one that misspoke. I think everyone understood that it did go into that account, and then payments were made from that account. Are we on the same page now? Well, you can't take money from a taxable account and deposit it into an IRA. You can't do that. That's not permitted. And I also want to indicate clearly that the $96,690 that Mr. Nelson has acknowledged was there at the end of 2013 was the end of 2013. She continued to make 529 gifts to her grandchildren. She continued to use the money for various other purposes. So we've got this duration of time between 2013 and May of 2017 when she gets this letter that says, owe us $200,000 and whatever it is. So what's your, if you don't think $90,000 is the right number, where's the record evidence for the right number? We never went into that. We never went into that. What we said is... Okay, I got that. The next question is, so I'm trying to figure out the right way to think about this. Well, just keep going, keep going, and then I'll come back to it. I'll give you extra time. Keep going. Okay. All right. It was said that she never raised any questions about the benefit commencement date. My client never knew what benefits commencement date was utilized by Ford when they calculated the payment to her that was to be made. Never. Every single document in the record reflects a benefit commencement date of March of 2009. Why didn't she ask for a hardship when they invited her to say, well, if you want to make the argument that it's going to be hard to pay this back? My understanding is she didn't take them up on that. That's correct. For the reasons that we cited in the appeal, 42 months went by before Ford made a claim for return of this money. After having deposed... Well, sorry. After having reviewed the documents, it was my belief that she didn't owe the money because the plan... You can argue in the alternative. You can say, we don't owe the money, but if we do owe the money, we think it would only be fair if we paid back 50,000 or something, given that she'd spent a lot of it, for example. Well, it was her position that after what she went through with Ford for the six months, and again, the record documents the number of communications and complaints and discussions and conferences and all of that that were done, she was flabbergasted that they would, after 42 months, come back and say, you owe us $238,000. Finally, I just want to say, Mr. Nelson also indicated there was never any questions raised about the retroactive amount. When you ask to have all the numbers recalculated, that includes all the numbers recalculated. That specifically was asked of the financial consultant for Ms. Zerval by Ford. Do you think that you anywhere asked to have the retroactive amount recalculated? The answer is, when we ask you to recalculate the numbers, don't we have the right to assume that we're asking you to recalculate all the numbers? Yeah, fair point. Okay. Unless you had any last thing to say. Well, I have lots of things to say, but my time is up. I think my brief did a reasonably good job of presenting the issues. Well, I'm really, really grateful to both of you for both your helpful briefs and above all, answering our questions. This is not the kind of case we do every day, so it's nice to have some people that know what they're doing and really appreciate your answers to our questions, and we'll try to work our way through it. Case will be submitted.